# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BILLY D. RALEIGH,** | ) | |
| Plaintiff | ) | Civil Action No. 2:22cv00011 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Billy D. Raleigh, ("Raleigh"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.""" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Raleigh protectively filed applications for DIB and SSI on February 27, 2018, alleging disability as of February 1, 2016, due to hypothyroidism; high blood pressure; a torn labrum; bursitis in both knees; bulging discs in the back; a narrowing spinal canal; chronic depression; blackout spells; anxiety attacks; and a Vitamin B-12 deficiency. (Record, ("R."), at 10, 242-43, 246-49, 271.) The claims were denied initially and on reconsideration. (R. at 157-59, 164-66, 170-71, 173-86.) Raleigh requested a hearing before an administrative law judge, ("ALJ"). (R. at 187-88.) A hearing was held on January 28, 2020, at which Raleigh was represented by counsel. (R. at 48-81.)

By decision dated March 2, 2020, the ALJ denied Raleigh's claims. (R. at 10-35.) After the ALJ issued her decision, Raleigh pursued his administrative appeals, (R. at 238-41, 362-64), and the Appeals Council denied his request for review. (R. at 1-5.) Raleigh then filed an action in this court seeking review of the ALJ's unfavorable decision, which stood as the Commissioner's final decision. *See Raleigh v. Saul*, Civil Action No. 2:20cv00035 (W.D. Va. Nov. 23, 2020); *see also* 20 C.F.R. §§ 404.981, 416.1481 (2022). However, on June 3, 2021, the Commissioner filed a Motion To Remand pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further consideration of Dr. Kumar's medical opinion evidence and Raleigh's residual functional capacity. (Docket Item No. 12.) By Order entered June 4, 2021, this court granted the Motion To Remand. (R. at 1771.) In accordance with this court's Order, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings on July 12, 2021. (R. at 1775-76.) The ALJ held another hearing on December 2, 2021, at

-2-

which Raleigh was again represented by counsel. (R. at 1693-1729.) By decision dated January 6, 2022, the ALJ denied Raleigh's claims. (R. at 1616-46.) The ALJ noted that the case was on remand for further consideration of Dr. Kumar's opinion regarding Raleigh's ability to sit, stand and walk for a full workday and to give further consideration to Raleigh's maximum residual functional capacity during the entire period at issue. (R. at 1616.) The ALJ also noted that Raleigh had filed subsequent DIB and SSI applications on October 29, 2020, which were consolidated and addressed in the decision.[1] (R. at 1616.) The ALJ found Raleigh met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2021. (R. at 1618.) The ALJ found Raleigh had not engaged in substantial gainful activity since February 1, 2016, the alleged onset date. (R. at 1619.) The ALJ determined Raleigh had severe impairments, namely, degenerative disease of the spine; knee bursitis; left hip labral tear; onset of diabetes diagnosed in the last one to two years; anxiety; depression; and bipolar disorder, but he found Raleigh did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1619-25.)

The ALJ found Raleigh had the residual functional capacity to perform sedentary[2] work, except he could lift and carry items weighing 15 pounds occasionally and five pounds frequently; stand/walk for two hours and sit for six to

---

[1] These applications are not contained in the record. However, the initial determination associated with these claims is, and it indicates that Raleigh claimed disability based on the same impairments as his previous claims, as well as the following: social anxiety, type 2 diabetes and severe bipolar disorder. (R. at 1779.) Raleigh indicated an alleged onset date for these new DIB and SSI claims of March 3, 2020, the date following the ALJ's unfavorable decision. (R. at 1941.)

[2] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2022).

eight hours of an eight-hour workday; occasionally push and pull with all extremities and occasionally operate foot controls; frequently, but not constantly, reach, handle and finger, bilaterally; never crawl or climb ladders or scaffolds; occasionally kneel, crouch, stoop, balance and climb steps or stairs; he should avoid concentrated exposure to extreme cold temperatures and avoid all exposure to particularly dangerous hazards, such as moving machinery and vibrating surfaces; his concentration, persistence, maintaining of pace and cognition were adequate for performing simple, routine tasks and following simple (non-complex) work instructions; he could occasionally interact with the public, co-workers and supervisors; and he could not perform fast-paced production work. (R. at 1625.) The ALJ found Raleigh was unable to perform any of his past relevant work. (R. at 1644.) Based on Raleigh's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existing in the national economy that Raleigh could perform, including the jobs of an addressing clerk, a document preparer and a weight tester. (R. at 1644-45, 1723-25.) Thus, the ALJ concluded Raleigh was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits from February 1, 2016, through the date of his decision. (R. at 1645-46.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2022).

After the ALJ issued his decision, Raleigh pursued his administrative appeals, (R. at 1991-93), but the Appeals Council denied his request for review. (R. at 1607-12.) Raleigh then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. This case is before this court on Raleigh's motion for summary judgment filed November 30, 2022, and the Commissioner's motion for summary judgment filed December 15, 2022.

*II. Facts*

Raleigh was born in 1977, (R. at 242, 246), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and past relevant work as a night stocker, a bagger and a dairy manager, all in the grocery store setting. (R. at 272, 1702-03.) Among other things, Raleigh testified he suffered from low back pain and bursitis in his leg, which caused him to eventually stop working in 2016. (R. at 1704-05.) He stated he continued to have low back, hip and left leg problems at the time of the hearing. (R. at 1705.) Raleigh said he had undergone one epidural shot in his back, two in his hip and one in his left knee, but he continued to have constant, severe pain, aggravated by walking or being on his feet for too long. (R. at 1705-07.) He estimated he could stand or walk 10 to 15 minutes before having left foot and leg numbness. (R. at 1707.) Raleigh stated sitting for extended periods bothered his hip, made his legs numb and hurt his back, and he estimated he could sit for up to 30 minutes in one position, but he had to shift his weight. (R. at 1711-12.) Raleigh said he could not stoop, squat, bend or kneel because his knees would give out. (R. at 1713.) He testified he spent up to six hours a day reclining or lying down to ease his leg and hip pain. (R. at 1712.) Raleigh said his medical providers had not discussed back surgery, but had instructed him to take injections. (R. at 1713.)

Raleigh, who is right-hand dominant, testified he also had pain in the left side of his neck and left arm down to his fingers, which caused difficulty gripping, as well as holding objects above his head and out at chest level. (R. at 1707-08.) He testified he could use his right hand repetitively at tabletop or chest level for three to five minutes, and if he raised his hands above his head, they would become heavy and fall. (R. at 1708-09.) Raleigh estimated he could lift and carry five pounds for

two to three minutes, but he could not handle five pounds off and on for one-third of a workday due to numbness.  (R. at 1710-11.)

Raleigh also testified he had suffered from anxiety and depression since he was in school, and he had been psychiatrically hospitalized twice for depression and suicidal thoughts.  (R. at 1713, 1722.)  He said he had suicidal thoughts all the time, which he did not act on.  (R. at 1713.)  Raleigh said he had been in mental health treatment pretty much continuously since about 2016, and his mental health medication helped very little.  (R. at 1713-14.)  He described his symptoms as feeling worthless, having insomnia, hating life in general, wanting to die and having anxiety and panic attacks, which wiped him out for a day or two afterwards.  (R. at 1714.)  Raleigh also testified he experienced episodes of blacking out at least once monthly for the previous four or five years.  (R. at 1709.)

Raleigh testified he had always lived with his parents.  (R. at 1716.)  He said he did not perform household chores and spent most of his time in bed watching television.  (R. at 1717-18, 1721.)  He testified he left the house mostly for medical appointments, to which his father drove him because he had never obtained a driver's license.  (R. at 1718, 1722.)  Raleigh said he liked to go outside, and he tried to stay busy and keep his mind occupied with reading a book "or anything."  (R. at 1715-16.)

In rendering his decision, the ALJ reviewed records from Watauga Orthopedics; Norton Community Hospital; East TN Brain and Spine Center, P.C.; Appalachian Healthcare Associates, P.C.; Mountain View Regional Medical Center, ("Mountain View"); CVA Heart Institute; Dickenson Community Hospital; Dickenson County Behavioral Health; Cumberland Mountain Community Services; The Laurels; University of Virginia Health System, ("UVA"); Wellmont Medical

Associates; William A. Davis Clinic, ("the Clinic"); Dr. Vijay Kumar, M.D.; Dr. Uzma Ehtesham, M.D.; Sycamore Shoals Hospital; Blue Ridge Neuroscience Center; Creekside Behavioral Health, ("Creekside"); Stone Mountain Health Services; Bristol Neurosurgical Associates; Highlands Neurosurgery; Bristol Regional Medical Center; Mountain Comprehensive Health Corporation; Health Connect America, ("Health Connect"); Southern Medical Group, Inc.; Leigh Ann Ford, Ph.D.; Owsley County Behavioral Health Clinic; The Optometry Group, P.L.L.C.; Dr. Catherine Howard, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Leslie E. Montgomery, Ph.D., a state agency psychologist; and Howard S. Leizer, Ph.D., a state agency psychologist.

An MRI of Raleigh's left knee, dated August 6, 2014, showed very mild bursitis, but the menisci and ligaments were intact. (R. at 583.) X-rays of Raleigh's lumbar spine, dated December 4, 2014, were normal. (R. at 639.) A lumbar spine MRI, dated January 19, 2015, showed scattered, multi-level degenerative changes. (R. at 380-81.) On April 2, 2015, Isaac O'Dell, P.A., a physician assistant at East TN Brain and Spine Center, P.C., explained to Raleigh that the MRI showed no evidence of nerve root compression, and an electromyogram, ("EMG"), of the left leg was normal. (R. at 389, 432, 460-66.) Given those findings, O'Dell stated he had nothing further to offer from a neurosurgical standpoint, including epidural steroid injections, and he recommended continued conservative treatment. (R. at 389, 432.) He diagnosed pain in a lower limb; and low back pain. (R. at 388-89, 433.)

Raleigh presented to the emergency department at Mountain View on July 31, 2015, reporting two episodes of loss of consciousness in the prior week. (R. at 591-92.) He explained that his work environment was hot, and he slept in a room without

air conditioning. (R. at 592.) A CT of Raleigh's head showed no acute intracranial abnormality. (R. at 582.)

Raleigh presented to Dickenson County Behavioral Health on June 30, 2016, for an initial assessment at the referral of the probation office.[3] (R. at 740.) He reported having anxiety and depression his whole life, but he denied suicidal ideation or having received any prior treatment. (R. at 741-42.) Raleigh stated he liked horseback riding and being outside, and he denied needing assistance with activities of daily living. (R. at 741.) He was diagnosed with anxiety disorder, unspecified; and depressive disorder, unspecified, and he was scheduled to begin counseling with Cody Ball, L.M.H.P., a licensed mental health professional, on July 15, 2016. (R. at 736.) At that time, Raleigh reported he had been prescribed medication for his anxiety and depression, but he had not taken it in about a year due to losing his insurance. (R. at 732.) He stated he was not employed, but he wanted to work, and he reported spending time with family and friends, cooking out and fishing. (R. at 732-33.) Raleigh denied needing assistance with bathing, dressing, ambulating, grooming, meal preparation, housekeeping, doing laundry or shopping. (R. at 733.) He was fully oriented, but he reported struggling daily with depression and often being so nervous that he shook. (R. at 734.) Ball diagnosed anxiety disorder, unspecified; other depressive episodes; and other general symptoms and signs. (R. at 735.) Raleigh continued seeing Ball through June 7, 2017. Over this time, his mood consistently was normal, he denied suicidal and homicidal ideation, and he reported normal stressors, including financial stress. (R. at 722, 724, 726, 728.) On November 1, 2016, Raleigh reported helping a friend "put up fences" and making a little extra money. (R. at 728.) He noted some continued depression since losing

---

[3] Raleigh explained he had been falsely accused by a woman at work of sexual battery, for which the court placed him on one year of probation and recommended counseling. (R. at 732, 742.) He stated he also was fired from his job. (R. at 742.)

his job.  (R. at 728.)  On January 18, 2017, Raleigh reported continuing to help a friend care for his horses and helping care for his mother who recently had undergone surgery.  (R. at 726.)  He stated he stayed home a lot.  (R. at 726.)  On April 24, 2017, Raleigh told Ball he quit a job before it even started when the woman who claimed he sexually assaulted her was at the orientation.  (R. at 724.)  He said he hoped to get a job interview the following week at Tractor Supply.  (R. at 724.)  However, on May 22, 2017, Raleigh reported he did not get the interview, and he was planning to move out of the county the following month to seek work.  (R. at 722.)  When Raleigh was discharged from services on June 7, 2017, Ball indicated he was open and cooperative during visits, he seemed to cope better with daily stress, and he completed treatment successfully.  (R. at 719, 721.)

On November 29, 2016, Raleigh saw Anita Coe, N.P.-C., a certified nurse practitioner at the Clinic, to establish primary care.  (R. at 980.)  He reported having been off his medications, including Buspar and Zoloft, for a year since losing his insurance.  (R. at 980.)  Raleigh was in no acute distress; his gait was normal; neurological examination was normal; and he was fully oriented, with a euthymic mood and appropriate affect.  (R. at 981.)  Coe diagnosed, among other things, major depressive disorder, recurrent, unspecified, and she prescribed Zoloft and Buspar.  (R. at 981, 983.)  When Raleigh was seen at Wellmont CVA Heart Institute on December 6, 2016, for an evaluation of chest pain, he had a normal gait; grossly intact sensory and motor function; and his mood was appropriate with normal judgment.  (R. at 596, 598-99.)  An EKG revealed a left atrial abnormality, with right

bundle branch block, ("RBBB"),[4] and left posterior fascicular block, ("LPFB").[5] (R. at 599, 602.)   Dr. Daniel Simpson, M.D., diagnosed atypical chest pain of a noncardiac nature; hypertension; and RBBB.  (R. at 599.)  When Raleigh returned to Coe on December 14, 2016, he reported his depression was doing well with medication.  (R. at 987, 989.)  On March 16, 2017, Raleigh's examination remained unchanged.   (R. at 994.)   Coe diagnosed major depressive disorder, recurrent, unspecified; and generalized anxiety disorder, and she continued Zoloft and increased Buspar to twice daily at Raleigh's request.  (R. at 992, 994-96.)  On March 29, 2017, Raleigh reported low back pain, which he rated a six on a 10-point scale, and which had been radiating into his left hip for about a month.  (R. at 998.)  On examination, Raleigh again exhibited normal findings, except for limited flexion of the lumbar spine and positive straight leg raise testing on the left.  (R. at 1000.)  Coe diagnosed low back pain, and she prescribed a muscle relaxer and ibuprofen and advised Raleigh to use heat.  (R. at 1001.)  Raleigh refused physical therapy due to cost.  (R. at 1001.)  On May 8, 2017, Raleigh reported night sweats, waking up dehydrated and passing out.  (R. at 1003.)   Examination was normal, and Coe ordered an EKG and a Holter monitor.  (R. at 1006-08.)  The Holter monitor showed rare premature atrial contractions, ("PACs"),[6] but was, otherwise, normal, and Coe

---

[4] A bundle branch block is a condition in which there is a delay or blockage along the pathway that electrical impulses travel to make the heart beat.  Rarely, symptoms of bundle branch block may include fainting or feeling as if you are going to faint.   *See* https://www.mayoclinic.org/diseases-conditions/bundle-branch-block/symptoms-causes/syc-20370514 (last visited Aug. 9, 2023).

[5] A left posterior fascicular block is an obstruction in the transmission of electrical impulses in the left ventricle of the heart, which leads to an abnormal heartbeat.  Most often, it is caused by coronary artery disease or another heart condition.  *See* https://my.clevelandclinic.org/health/diseases/23288-left-posterior-fascicular-block (last visited Aug. 9, 2023).

[6] PACs are extra heartbeats that begin in one of the heart's two upper chambers, or atria. *See* https://my.clevelandclinic.org/health/diseases/21700-premature-atrial-contractions (last visited Aug. 9, 2023).

diagnosed syncope and collapse.  (R. at 1007, 1012-21.)  On June 12, 2017, Raleigh reported sciatica down the left hip and left leg.  (R. at 1022.)  Examination continued to yield normal findings, except for tenderness to palpation over the sciatic notch. (R. at 1025.)  Coe diagnosed left-sided sciatica, and they discussed stretching and occasional use of nonsteroidal anti-inflammatory drugs, as Raleigh continued to refuse a physical therapy referral.  (R. at 1025-26.)  On July 18, 2017, Raleigh wished to increase his Zoloft, and he was receptive to seeing behavioral health.  (R. at 1028.)  He also reported continued hip pain, despite doing exercises for sciatica. (R. at 1028.)  On examination, Raleigh was alert and fully oriented, with appropriate judgment, good insight, intact recent and remote memory, a euthymic mood and an appropriate affect.  (R. at 1031.)  Coe diagnosed left hip pain; and major depressive disorder, recurrent, unspecified, and she increased his Zoloft and ordered hip x-rays. (R. at 1031-32.)

Raleigh presented to the emergency department at Dickenson Community Hospital on August 29, 2017, with complaints of a possible seizure after passing out at home.  (R. at 608, 617.)  Examination was normal, including no focal weakness or sensory loss.  (R. at 609.)  A CT scan of Raleigh's head showed no acute intracranial abnormality, and an ECG showed the RBBB and a LPFB.  (R. at 604-06.)  Raleigh was diagnosed with syncope and discharged home in stable condition. (R. at 609.)  When he saw Coe on August 31, 2017, he advised her of this emergency department visit.  (R. at 1036.)  Raleigh stated he had a bundle branch block, but testing was, otherwise, normal, and he had no problems since that time except for weakness, which was typical after such an episode.  (R. at 1036.)  Examination yielded normal cardiovascular and neurological findings; a normal gait; and full orientation, with a euthymic mood and appropriate affect.  (R. at 1037.)  Coe diagnosed syncope and collapse, instructed Raleigh not to drive or operate machinery and referred him to neurology.  (R. at 1037-38.)

On September 5, 2017, Raleigh saw Emily Steffey-Stacy, P.M.H.N.P., a psychiatric mental health nurse practitioner at the Clinic, to establish as a new patient. (R. at 1053.) He reported Zoloft helped some, but he had not noticed any mood improvement after it was increased a month or two previously. (R. at 1053-54.) Raleigh continued to endorse symptoms of depression and anxiety; he said he could not tolerate big crowds; he said, "I've seen funny things," describing black figures two to three months previously, but nothing since that time; and he admitted to passive suicidal ideation, but denied intent or plan. (R. at 1053.) He denied that his recent separation from his wife of six months was affecting his mood. (R. at 1053.) Raleigh reported enjoying riding horses, which he continued to do. (R. at 1053.) His physical complaints included sciatica/leg pain and blacking out, which had happened two or three times yearly for the last two years. (R. at 1053.) On examination, he was ambulatory without an assistive device; he had normal muscle tone, bulk and strength; abnormal movements, but no rigidity, spasticity or flaccidity; and a normal gait. (R. at 1058.) On mental status examination, Raleigh had normal speech; intact thought process; no suicidal or homicidal ideations or hallucinations; appropriate judgment; good insight; full orientation; intact recent and remote memory; good attention and concentration; an anxious/depressed mood and interactive affect; he was able to name objects and repeat phrases; he was aware of current events; he had knowledge of past history; and he had intact vocabulary. (R. at 1058.) Steffey-Stacy diagnosed dysthymic disorder; generalized anxiety disorder; syncope and collapse; and left-sided sciatica. (R. at 1058.) She increased Raleigh's Zoloft and said she would consider adding Wellbutrin if the neurologist ruled out a seizure disorder. (R. at 1059.)

On October 25, 2017, Raleigh presented to Dickenson County Behavioral Health, reporting increased depression and anxiety and requesting inpatient treatment. (R. at 716, 718.) He stated his wife's mental health issues were causing

him to "go off the deep end," and he reported recent thoughts of being "better off dead," with no specific suicidal plan.  (R. at 718.)  He received inpatient treatment at The Laurels for one week, from October 25 to October 31, 2017.  (R. at 856-950.)  On October 26, 2017, he advised Dr. James Reinhard, M.D., that he had experienced suicidal ideation, triggered by his wife's recent separation from him, which "kicked [him] to the lowest of lows."  (R. at 856.)  He reported a history of chronic suicidal thoughts with no prior attempts and a history of anxiety and depression since age 10.  (R. at 856.)  Raleigh stated his "nerves got the best of me, I didn't care if I lived or if I die."  (R. at 856.)  On mental status examination, he was alert and fully oriented, polite, pleasant and calm; casually dressed with good hygiene; reasonable eye contact; normal speech; a reportedly anxious and depressed mood, with some mood instability; no current suicidal or homicidal ideations or current intent or plan to harm himself; no evidence of a formal thought disorder; no delusions; linear, logical and goal-directed thoughts; good concentration and memory; impaired judgment and insight; and no abnormal movements.  (R. at 857.)  Dr. Reinhard diagnosed major depression, chronic, recurrent, and added Abilify to Raleigh's treatment regimen.  (R. at 857.)  The next day, Raleigh reported a better mood and feeling like he was stabilizing.  (R. at 858.)  Over his time at The Laurels, Raleigh participated in both group and individual counseling sessions.  (R. at 893, 896, 898, 902, 904, 906, 909-11, 914, 916, 918, 920-23, 925-28, 930-31, 933-34, 936-37, 939-40, 944-46, 948.)  On October 31, 2017, he denied suicidal or homicidal ideation and hallucinations, he stated his medications were working, and he reported decreased anxiety and depression and improved sleep.  (R. at 948.)  Raleigh was discharged that day on Zoloft and Abilify with a follow-up appointment with behavioral health.  (R at 871.)

On November 7, 2017, Raleigh returned to the Clinic, complaining of constant and worsened, radiating left hip pain and requested a referral to UVA.  (R. at 1045.)  Although he rated his pain as an eight, Coe noted he was sitting quietly with his legs

crossed in no obvious distress.  (R. at 1045.)  Raleigh reported no syncopal episodes since his previous visit, and he had an appointment to see a neurologist later that month.  (R. at 1045.)  Coe noted Raleigh's recent psychiatric hospitalization and that he was requesting to be referred to a psychiatrist.  (R. at 1045.)  Raleigh reported doing better since his discharge.  (R. at 1045.)  Examination yielded normal findings, except for tenderness to palpation of the left leg, but with a normal, but painful, range of motion.  (R. at 1048-49.)  Coe diagnosed left hip pain; generalized anxiety disorder; and major depressive disorder, recurrent, unspecified, she referred him to UVA for his left hip pain, she ordered an MRI, and she referred him to behavioral health.  (R. at 1049, 1051.)

Raleigh saw Dr. Frank Gwathmey, M.D., an orthopedic surgeon at UVA, on December 11, 2017, for an evaluation of left hip pain.  (R. at 955.)  Raleigh endorsed left leg weakness and paresthesias, radiating to his foot, as well as some left-sided low back pain.  (R. at 955.)  He said stretching provided minimal relief, but he had not undergone physical therapy or injections.  (R. at 955.)  On examination, Raleigh had unremarkable posture and alignment and a nonantalgic gait; decreased range of motion of the left hip; grossly intact motor function, bilaterally; intact sensation throughout; and symmetrical pedal pulses.  (R. at 956-57.)  Pelvic x-rays from this date showed no evidence of acute abnormality or significant degenerative change, but an MRI of the left hip showed a nondisplaced left anterosuperior acetabular labral tear; tendinosis and low-grade partial thickness tearing of the hamstring origins, bilaterally, left greater than right; and a possible, small intra-articular loose body in the anterior joint space.  (R. at 958-60.)  Dr. Gwathmey diagnosed a left hip acetabular labral tear; and low back pain, and he recommended a steroid injection to differentiate Raleigh's hip pain from his back pain.  (R. at 957.)  Dr. Gwathmey performed this left hip injection, and he referred Raleigh to Dr. Joseph Amalfitano, D.O., for his low back pain.  (R. at 957.)

When Raleigh saw Dr. Amalfitano at UVA on January 9, 2018, he reported his back and hip pain was worsened by lifting and relieved with rest, but it was not relieved by Neurontin, naproxen, Flexeril, Advil or the hip injection.  (R. at 952-53.)  He stated he could not afford physical therapy.  (R. at 953.)  Raleigh reported numbness and tingling in the left toes for the previous year.  (R. at 953.)  On examination, he had a nonantalgic gait; no ecchymosis, effusion or swelling; no midline lumbar tenderness, but tenderness along the left quadratus lumborum, lumbar paraspinals and piriformis; decreased lumbar extension; full strength in both legs; positive FABER test[7] on the left; negative scour test;[8] equivocal facet loading, bilaterally; negative straight leg raise testing; 2+ reflexes at the patella and at the Achilles, bilaterally; intact sensation; no clonus; and negative Babinski.  (R. at 954.)  Dr. Amalfitano diagnosed chronic low back pain with left-sided sciatica; myofascial pain; lumbar degenerative disc disease; and sacroiliac, ("SI"), pain on the left, and he referred Raleigh to physical therapy and for a left SI steroid injection.  (R. at 954.)  He also recommended a temporary combination of Mobic and Zanaflex and consideration of obtaining an updated lumbar MRI if no improvement.  (R. at 954.)  When Raleigh was contacted on January 23, 2018, to schedule the SI injection, he advised staff he did not wish to do so at that time.  (R. at 952.)

Raleigh continued treating at the Clinic with Coe, Steffey-Stacy and others from January 22, 2018, through April 9, 2018.  Over this time, he had largely normal physical examinations, including a normal gait; normal lumbar lordosis; normal

---

[7] The FABER test is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine or SI region.  It is a passive screening tool for musculoskeletal pathologies, such as hip, lumbar spine or SI joint dysfunction, or an iliopsoas spasm.  *See* https://www.physio-pedia.com/FABER_Test (last visited Aug. 9, 2023).

[8] A quadrant scour test is a passive test used to assess if the hip is the source of a patient's symptoms.  This test also is capable of detecting early hip degeneration.  *See* https://www.physio-pedia.com/Hip_Quadrant_Test (last visited Aug. 9, 2023).

lumbar spine range of motion; no tenderness to palpation or joint instability of the left leg; normal right leg; normal neurological findings; he was ambulatory without an assistive device; and he had normal muscle tone, bulk and strength, with no rigidity, spasticity or flaccidity. (R. at 1066-67, 1081 1090, 1104.) Raleigh did exhibit tenderness to deep palpation of the lumbar spine; limited range of motion of the left leg due to pain; and unspecified abnormal movements. (R. at 1066-67, 1081, 104.) In March 2018, he reported having had no syncopal episodes since August 2017. (R. at 1076.) Raleigh advised Coe he was "about the same." (R. at 1076.) Later that month, he had a normal examination, including a normal gait and normal neurological findings. (R. at 1090.) On March 28, 2018, he reported being busy with his horses the last few days, and he said he worked with a friend. (R. at 1094.) Coe diagnosed Raleigh with left hip pain, and Steffey-Stacy diagnosed syncope and collapse; and left-sided sciatica. (R. at 1067, 1082.)

In terms of his mental health impairments over this time, Raleigh, likewise, had largely normal examinations. In January 2018, Coe found he was fully oriented, with a euthymic mood and appropriate affect. (R. at 1066-67.) The following month, when Raleigh started seeing Katie Barnett, L.C.S.W., a licensed clinical social worker, for counseling, his mental status examination yielded largely normal findings. Specifically, he was clean, neat and casual; he had an anxious mood with congruent affect; appropriate eye contact; full orientation; intact thought process; no paranoia or delusions; fair/poor judgment and insight; passive suicidal ideations; and no homicidal ideations. (R. at 1073.) On March 5, 2018, Steffey-Stacy noted Raleigh had normal speech; intact thought process; intact recent and remote memory; good attention/concentration; intact vocabulary; and a depressed mood and interactive affect. (R. at 1082.) On March 16, 2018, he had a euthymic mood and appropriate affect. (R. at 1090.) On March 28, 2018, Barnett stated he was neat, clean and well-groomed; he had an anxious mood, and his affect was deemed

improved from his last visit; he had appropriate eye contact; full orientation; intact thought process; no paranoia/delusions; fair judgment/insight; and passive suicidal ideations, with no plan or intent. (R. at 1095-96.) On April 9, 2018, Steffey-Stacy's mental status examination of Raleigh was essentially unchanged, except she found he had impaired insight, and his mood was anxious in addition to depressed. (R. at 1104.) Raleigh continued to endorse depression and anxiety, passive suicidal ideation, with no plan or intent, panic attacks and a dislike of crowds. (R. at 1071, 1076, 1094, 1099.) In February 2018, he reported having two best friends and enjoying horse riding and anything outdoors. (R. at 1072.) Over this time, Cymbalta and Zoloft were discontinued, and Prozac was prescribed, which Raleigh reported helped some. (R. at 1083, 1099.) Raleigh's psychiatric diagnoses over this time included dysthymic disorder; generalized anxiety disorder; and major depressive disorder, recurrent, unspecified. (R. at 1067,1073, 1082, 1091.)

Raleigh saw Dr. Samuel Patton Deel, D.O., on April 5, 2018, for bilateral knee pain. (R. at 972.) Dr. Deel noted Raleigh's history of a torn labrum of the left knee, that a prior gluteal cortisone injection had been helpful and that he had seen a neurosurgeon at UVA for a bulging disc. (R. at 972.) He also noted Raleigh's depression, which was described as moderately worsening and constant, was helped with psychotherapy, but not by Cymbalta, and worsened by emotional stress and family stressors. (R. at 972.) On examination, Raleigh was fully oriented with a normal mood and affect, normal behavior, normal judgment and thought content; he had normal cardiovascular and pulmonary findings; and he had a normal range of musculoskeletal motion, with no edema. (R. at 976.) Dr. Deel diagnosed, among other things, moderate episode of recurrent major depressive disorder; chronic left-sided low back pain with left-sided sciatica; and bilateral chronic knee pain. (R. at 976-77.) He prescribed Prozac and Lyrica, and he referred Raleigh to an orthopedic surgeon for his knee pain. (R. at 976-77.)

Leslie E. Montgomery, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on July 6, 2018, finding Raleigh had no limitations on his ability to understand, remember or apply information and to adapt or manage himself, but moderate limitations on his ability to interact with others and to concentrate, persist or maintain pace. (R. at 88-89.) Montgomery noted Raleigh's history of anxiety and depression with ongoing mood symptoms. (R. at 89.) Montgomery also completed a mental residual functional capacity assessment, finding Raleigh had no understanding and memory limitations and no adaptation limitations. (R. at 92-94.) Montgomery opined Raleigh was moderately limited in his ability to maintain attention and concentration for extended periods;[9] to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact with the general public. (R. at 93.) In all other areas of mental functioning, Montgomery opined Raleigh was not significantly limited. (R. at 93-94.) Montgomery found Raleigh could provide simple directions or answer simple directions. (R. at 94.) In arriving at these opinions, Montgomery noted Raleigh's history of depression and anxiety and his current involvement in outpatient treatment and counseling. (R. at 94.) Nonetheless, Montgomery noted Raleigh continued to have an anxious mood with some improvement with affect. (R. at 94.) She concluded Raleigh could perform simple, routine tasks with limited social contact. (R. at 94.)

Also on July 6, 2018, Dr. Catherine Howard, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Raleigh could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand and/or walk a total of about six hours in an eight-hour workday; sit about six hours in an

---

[9] Montgomery opined Raleigh could attend to tasks for two-hour periods sufficiently to complete a normal workday and workweek. (R. at 93.)

eight-hour workday; occasionally use the left lower extremity to operate foot controls; occasionally perform all postural activities; and must avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 90-92.) Dr. Howard based these findings on Raleigh's multi-level degenerative disc disease of the lumbar spine and left acetabular tear of the left hip. (R. at 91-92.)

Raleigh saw Dr. Vijay Kumar, M.D., on July 9, 2018, to establish care for his chronic low back pain and sciatica, for which he was taking Lyrica. (R. at 1261, 1264.) On examination, he was alert, fully oriented and in no acute distress; conversant; grossly intact neurologically; exhibited normal cardiovascular and respiratory findings; had paraspinal tenderness/spasm; positive straight leg raise testing, bilaterally; positive radicular pain, bilaterally; no extremity edema; and normal speech and language. (R. at 1265.) Dr. Kumar diagnosed chronic sciatica and lumbar radiculopathy, among other things, and he discontinued Lyrica and prescribed Neurontin. (R. at 1265.) He advised weight bearing exercises and stress management. (R. at 1265.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF of Raleigh on September 25, 2018, finding he was moderately limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 124-25.) Leizer also completed a mental residual functional capacity assessment, finding Raleigh was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

-19-

consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting.  (R. at 128-30.)  In all other areas, Leizer opined Raleigh was not significantly limited.  (R. at 128-30.)  He based these findings on symptoms of major depressive disorder and anxiety disorder.  (R. at 128-30.)  However, he noted that examinations showed a good attention span and concentration, intact memory, and, overall, Raleigh could make simple, work-related decisions and attend to tasks for two-hour periods sufficiently to complete a normal workday and workweek.  (R. at 129.)  Leizer also noted Raleigh's dislike of crowds, but that, overall, he could provide simple directions or answer simple directions.  (R. at 129.)

On September 25, 2018, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical residual functional capacity assessment of Raleigh, finding he could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand and/or walk a total of about six hours in an eight-hour workday; sit a total of about six hours in an eight-hour workday; occasionally use the left lower extremity for the operation of foot controls; and perform all postural activities occasionally, except balancing, which he could perform frequently.  (R. at 126-28.)  Dr. Hutcheson found Raleigh had no manipulative, visual, communicative or environmental limitations.  (R. at 127.)  He based his findings on Raleigh's thoracic spinal tenderness to deep palpation; limited left leg range of motion due to pain; positive straight leg raise testing, bilaterally; symptoms from chronic pain syndrome; multi-level degenerative disc disease of the lumbar spine; and left acetabular tear of the left hip.  (R. at 127.)

Raleigh continued to treat with Dr. Kumar through December 2019 for complaints of radiating low back pain, hip pain, right gynecomastia, tingling and numbness in both feet, chronic neuropathy and fatigue.  (R. at 1281, 1480, 1486,

1516, 1553.)  On August 1, 2019, Raleigh advised Dr. Kumar he found a lump in his right breast the prior month that had grown in size.  (R. at 1274, 1276-77.)  A bilateral mammogram, dated August 12, 2019, was compatible with gynecomastia.[10]  (R. at 1295.)  An MRI of Raleigh's lumbar spine, dated September 18, 2019, showed mild degenerative disc disease and facet arthrosis; and mild constriction of the thecal sac and mild to moderate neuroforaminal narrowing at the L4-L5 level.  (R. at 1272-73.)  On September 23, 2019, Dr. Kumar stated these findings represented no significant change from a prior 2015 MRI, and he referred Raleigh to a neurosurgeon.  (R. at 1292.)  On October 29, 2019, Raleigh underwent a subcutaneous mastectomy, and pathology showed benign breast tissue, consistent with gynecomastia.  (R. at 1419, 1421-22.)  In November 2019, Dr. Kumar referred Raleigh to a neurologist for his complaints of tingling and numbness in the feet and chronic neuropathy.  (R. at 1553-54.)

Raleigh's physical examinations over this time yielded largely normal findings, including paraspinal tenderness/spasm of the back; positive straight leg raise testing, bilaterally; radicular pain in both legs; no clubbing, cyanosis or edema of the extremities; no varicosities or calf tenderness; full musculoskeletal strength in all extremities, with full range of motion and no pain or crepitus; no atrophy, weakness, spasticity or tremors of the extremities; no joint deformity; gait was steady, stable, fluid and coordinated; sensation and finger-to-nose coordination were intact; and peripheral pulses were 2+ and equal, bilaterally.  (R. at 1277, 1282, 1291, 1480, 1486, 1492, 1504, 1516, 1547, 1553 1563.)  Likewise, Raleigh's mental status examinations were normal, reflecting that he was alert, cooperative and fully oriented, with normal appearance, behavior, speech and language; coherent

---

[10] Gynecomastia is an increase in the amount of breast gland tissue in boys or men, caused by an imbalance of the hormones estrogen and testosterone.  This condition may sometimes produce pain.  *See* https://www.mayoclinic.org/diseases-conditions/gynecomastia/symptoms-causes/syc-20351793 (last visited Aug. 9, 2023).

thoughts; intact remote and recent memory; an appropriate affect; he responded appropriately to questions; and he was well-groomed. (R. at 1277, 1282, 1291, 1480, 1486, 1492, 1504, 1510, 1547, 1553, 1563.) Over this time, Dr. Kumar diagnosed Raleigh with radiculopathy of the lumbar region; sciatica; neuropathy; fatigue; gynecomastia; chronic pain; unspecified anxiety state; social anxiety disorder; depression; anxiety; and a mood disorder. (R. at 1277, 1282, 1291, 1481, 1486-87, 1492-93, 1504, 1510, 1516, 1541, 1548, 1554, 1563-64.) He prescribed medications, including Neurontin, and he repeatedly recommended Raleigh perform weight bearing exercises, practice good body mechanics and stress management and follow with psychiatry. (R. at 1282, 1292, 1481, 1487, 1505, 1511, 1517, 1541, 1548, 1554, 1564.) Dr. Kumar also referred Raleigh to a neurosurgeon, who he saw in October 2019. (R. at 1541.)

In 2019, Dr. Kumar completed two physical assessments of Raleigh. The first one was on June 24, 2019, in which he opined Raleigh could occasionally lift/carry 25 pounds and frequently lift/carry 10 pounds; stand and/or walk a total of four hours in an eight-hour workday, but for 30 minutes without interruption; sit a total of three hours in an eight-hour workday, but for 20 minutes without interruption; occasionally perform all postural activities; pushing/pulling worsened his low back and hip pain; and he could not operate heavy machinery or work around vibration. (R. at 1269-71.) He based his findings on Raleigh's lower lumbar paraspinal spasm and tenderness; low back pain; and left hip stiffness and pain. (R. at 1269-71.) In a December 16, 2019, assessment, Dr. Kumar opined Raleigh could occasionally lift/carry 15 pounds and frequently lift/carry 10 pounds; stand and/or walk a total of three hours in an eight-hour workday, but for 15 minutes without interruption; sit a total of three hours in an eight-hour workday, but for 10 minutes without interruption; occasionally perform postural activities; pushing/pulling worsened his low back and hip pain; and he could not work around moving machinery and

vibration.  (R. at 1565-67.)  He based his findings on the same factors as the prior assessment.  (R. at 1565-67.)  In both of these assessments, Dr. Kumar opined Raleigh would miss more than two workdays monthly.  (R. at 1271, 1567.)

Raleigh also treated with Dr. Uzma Ehtesham, M.D., a psychiatrist, beginning in March 2019.  On March 7, 2019, he reported he was sad and had been depressed for years. (R. at 1473.)  On examination, Raleigh had fair hygiene and grooming; intermittent eye contact; nonspontaneous speech; normal motor activity; an anxious affect with congruent thought; no suicidal or homicidal ideations; fair insight and judgment; intact reality testing; and goal-oriented thought process. (R. at 1474.)  Dr. Ehtesham diagnosed bipolar I disorder, most recent episode mixed, moderate, and she prescribed Trileptal and continued Celexa.  (R. at 1474.)  Raleigh continued treating with Dr. Ehtesham throughout 2019.  Over this time, his examinations remained largely unchanged, with the exception of findings at some visits that he was agitated, anticipatory, worrisome, responding to internal stimuli, hypomanic and maintained eye contact.  (R. at 1437-75, 1573-82.)  Dr. Ehtesham's diagnosis of Raleigh remained the same throughout this time, but she adjusted his medications, including increasing and decreasing dosages, as well as discontinuing and starting medications, which included Lamictal, Seroquel, Remeron, lithium, and Vistaril. (R. at 1437-75, 1573-82.)  On March 21, 2019, Dr. Ehtesham completed a mental assessment of Raleigh, opining he was mildly limited in his ability to understand, remember and carry out simple job instructions; moderately limited in his ability to use judgment in public; to function independently; to understand, remember and carry out detailed job instructions; to maintain personal appearance; and to demonstrate reliability; markedly limited in his ability to follow work rules; to relate to co-workers; to maintain attention/concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations; and extremely limited in his ability to deal

with the public; to interact with supervisors; and to deal with work stresses.  (R. at 1266-68.)  She opined Raleigh would miss more than two workdays monthly.  (R. at 1268.)  Dr. Ehtesham based her findings on Raleigh's mood swings, anger issues, hallucinations, issues with concentration and attention and panic attacks.  (R. at 1267-68.)  She completed another mental assessment of Raleigh on December 5, 2019, making many of the same findings as previously, except for the following: he was moderately limited in his ability to understand, remember and carry out complex job instructions; and to relate predictably in social situations; markedly limited in his ability to deal with the public; and to understand, remember and carry out detailed job instructions; and extremely limited in his ability to relate to co-workers; to maintain attention/concentration; and to demonstrate reliability.  (R. at 1556-58.)  Dr. Ehtesham opined Raleigh would miss about two workdays monthly.  (R. at 1558.)  She based these findings on Raleigh's severe bipolar depression; recent hospitalization without improvement; crying spells and anxiety attacks; and decreased memory and concentration.  (R. at 1557-58.)

Raleigh saw Dr. David Pryputniewicz, M.D., a neurosurgeon at Blue Ridge Neuroscience Center, on October 1, 2019, for an evaluation of his back pain.  (R. at 1334.)  Raleigh reported having undergone no conservative therapy such as physical therapy or chiropractic care, and he said over-the-counter and prescribed medications, including Neurontin, NSAIDS, muscle relaxers, prescribed pain medications, heat therapy and topical creams provided only temporary pain relief.  (R. at 1334.)  He said the pain was aggravated by prolonged standing and sitting.  (R. at 1334.)  On examination, Raleigh had no edema or cyanosis of the extremities, and pulses were 2+, bilaterally; Fortin's test was positive on the left;[11] lumbar

---

[11] The Fortin Finger Test is used to detect SI joint dysfunction.  The patient is asked to localize the area of pain using one finger.  A positive test is when the patient twice identifies the painful region as the area inferomedial to the posterior superior iliac spine within one centimeter

paraspinal musculature was nontender to palpation, and lumbar spinal range of motion was normal; there was no tenderness to palpation of either lower limb or joint; range of motion was normal, and there was no pain on motion of the right lower extremity, but positive FABER and thigh thrust[12] of the left leg; he had full strength in the right leg and somewhat reduced strength in the left leg; sensation was intact in the extremities; and he was able to stand without difficulty, but gait was antalgic to the left.  (R. at 1336-37.)  Raleigh's mental status examination was normal, including full orientation; normal attention and concentration; normal mood; appropriate affect; good eye contact; and he engaged in the encounter.  (R. at 1336-37.)  Dr. Pryputniewicz noted lumbar MRI findings from the prior month, which he said did not reveal a pathological finding for Raleigh's symptoms.  (R. at 1337.)  However, because Raleigh tested positive for left SI joint dysfunction, Dr. Pryputniewicz planned to schedule a left SI joint diagnostic injection.  (R. at 1337.)  He diagnosed low back pain; left leg pain; and left SI dysfunction.  (R. at 1337.)

On October 10, 2019, Raleigh was psychiatrically hospitalized at Creekside for severe depression, anxiety and daily suicidal thoughts.  (R. at 1345.)  He denied intent or plan, and although he stated he heard voices every now and again, he denied hearing voices at the time of admission.  (R. at 1345.)  Raleigh was discharged on October 15, 2019, after making significant progress secondary to therapy and psychotropic medication management and adjustments.  (R. at 1346.)  At the time of discharge, Raleigh was alert and fully oriented, and he reported feeling greatly improved, including having no anxiety or depression symptoms, being better able to handle stress, having no suicidal or homicidal ideations and no hallucinations,

---

using one finger.  *See* https://www.physio-pedia.com/Fortin_Finger_Test (last visited Aug. 9, 2023).

[12]  The thigh thrust test is a provocation test for SI joint pain.  *See* https://www.physiotutors.com/wiki/thigh-thrust-test/ (last visited Aug. 9, 2023).

sleeping well, he could walk without assistance and appeared to have no physical limitations on mobility or function, and he denied any pain or discomfort. (R. at 1346.) Raleigh was diagnosed with bipolar disorder, unspecified, his medications, including Klonopin, Lamictal and Seroquel, were continued, and outpatient treatment was recommended. (R. at 1347-48.)

Raleigh returned to Barnett at the Clinic for individual counseling on December 3, 2019. (R. at 1568.) She noted he had not been seen since March 2018. (R. at 1568.) Raleigh reported he did not feel Lamictal, Seroquel and Klonopin were helping. (R. at 1568.) He reported his psychiatric hospitalization in October 2019, but said it was not very helpful because he could not open up. (R. at 1568.) Raleigh stated he had been diagnosed with bipolar I disorder, but he denied having elevated mood or risky behaviors. (R. at 1568.) He stated he and his wife remained separated, and he wanted a divorce, but had not yet filed paperwork. (R. at 1568.) Raleigh stated he got along well with his parents, with whom he lived, and he had some friends who were like family. (R. at 1568.) He said his back and hip pain had worsened since his last visit, and Dr. Kumar was referring him to neurosurgery. (R. at 1568.) Raleigh reported he no longer could help his friend with horses due to pain, he stayed in bed some days because he had "no desire to do anything," and he "lays and watches TV." (R. at 1568.) He also said he had no desire to be in public, as crowds triggered panic attacks, the most recent of which was three days previously. (R. at 1568.) Raleigh said these panic attacks lasted about 10 minutes, would subside if he left the public place and also were calmed with Klonopin. (R. at 1568.) On mental status examination, Raleigh was well-groomed and dressed appropriately; he was fully oriented, with a depressed and anxious mood with congruent behavior; he had normal eye contact and speech; poor insight and judgment; he admitted to passive suicidal ideation daily, but without plan or intent; and he had no hallucinations, delusions or paranoia. (R. at 1569-70.) Barnett

diagnosed generalized anxiety disorder; dysthymic disorder; and other symptoms and signs involving emotional state, and she recommended outpatient counseling. (R. at 1569-70.)

On December 27, 2019, Raleigh saw Mark Mehlferber, P.A., a physician assistant at Bristol Neurosurgical Associates, for a consultation for his low back pain. (R. at 1593.) On examination, he had decreased range of motion in back flexion and extension, with pain; full muscle strength in all major muscle groups; normal overall muscle tone; positive straight leg raise testing on the left at 40 degrees; grossly intact cranial nerves; normal sensation to light touch; normal deep tendon reflexes in all extremities; and he was alert and fully oriented, with an appropriate affect and demeanor, normal psychomotor function and normal speech pattern. (R. at 1593, 1595.) Mehlferber noted the September 2019 lumbar MRI showed degenerative changes without evidence of disc extrusion or spinal cord compression. (R. at 1593.) He diagnosed radicular syndrome of the lower limbs and radiculopathy of the lumbar region, and he ordered an EMG and nerve conduction study of the left leg for evaluation of chronic versus acute radiculopathy. (R. at 1593, 1595-96.) This testing, which was performed on January 14, 2020, was normal. (R. at 1591-92.) When Raleigh returned to Mehlferber that same day for a follow-up consultation, he explained there were no surgical indications at that time, and he recommended a lumbar epidural block for symptomatic relief. (R. at 1588.) If that worked, Mehlferber said, they would discuss the possibility of a selective nerve root block. (R. at 1588.) On examination, Raleigh had a normal gait; full strength in all major muscle groups; normal muscle tone; normal sensation; normal coordination and cerebellar function; no cyanosis or edema; he was alert and fully oriented, with an appropriate affect and demeanor; and he had normal psychomotor function, speech, thought and perception. (R. at 1589-990.) Mehlferber's diagnoses remained unchanged, and he ordered an interlaminar lumbar epidural steroid

injection, which Dr. Jim Brasfield, M.D., performed on January 24, 2020.  (R. at 1590, 1600-05.)

Raleigh continued treating with Dr. Kumar throughout 2020.  Over this time, he complained of dizziness, blackout spells, radiating back pain, low blood pressure, diabetes, left elbow pain, recurrent right breast lump, anxiety, depression and right leg swelling and redness.  (R. at 1585, 2041, 2043, 2045, 2051, 2053, 2059, 2061, 2063.)  Physical examinations continued to yield mostly normal findings, including no extremity clubbing, cyanosis or edema; supple and nontender calves; brisk capillary refill; 2+ and equal radial pedal pulses, bilaterally; good musculoskeletal range of motion; no joint deformity; no musculoskeletal swelling, erythema or crepitus; and a palpable lump in the right breast.  (R. at 1586, 2050, 2054, 2060-62, 2064.)   Over this time, Dr. Kumar diagnosed sciatica; dizziness; hypotension; tachycardia; type 2 diabetes; high blood pressure; left elbow pain; gynecomastia; and chronic pain.  (R. at 1586, 2041, 2048, 2050, 2054, 2056, 2062, 2064.)   On September 2, 2020, Raleigh reported he had not fallen in the past year, he did not feel unsteady when standing or walking, and he did not worry about falling.  (R. at 2047.)  On September 23, 2020, he said a mammogram and ultrasound of the right breast yielded no abnormal findings.  (R. at 2045.)  Also over this time, Dr. Kumar advised weight loss and to practice good body mechanics, he adjusted Raleigh's medications, ordered a Holter monitor, placed him on a diabetic diet, and he recommended heat and ice therapy for elbow pain.  (R. at 1587, 2041-62.)  Dr. Kumar completed a physical assessment of Raleigh on December 21, 2020, finding he could lift/carry five pounds occasionally and 10 pounds frequently; stand/walk a total of three hours in an eight-hour workday, but for 10 minutes without interruption; sit a total of three hours in an eight-hour workday, but for 15 minutes without interruption; occasionally perform postural activities; he could not push/pull or operate heavy machinery due to worsening low back pain and stiffness; and he

could not work around vibration.  (R. at 1994-96.)  Dr. Kumar opined Raleigh would miss more than two workdays monthly.  (R. at 1996.)  He based his findings on Raleigh's lower lumbar paraspinal muscle spasm/tenderness; and bilateral foot numbness/tingling.  (R. at 1994-96.)

With regard to Raleigh's mental health impairments, mental status examinations over this time continued to reflect normal findings, including being coherent, cooperative, pleasant, alert, fully oriented, clearly articulate, well-groomed, having an appropriate affect and responding appropriately to questions. (R. at 2041, 2043, 2045, 2047, 2050, 2054-55, 2058, 2060-61, 2064.)  Raleigh reported feeling depressed in May 2020.  (R. at 2055.)  On September 2, 2020, Dr. Kumar administered the Mini-Cog test, and Raleigh recalled three words without prompting.  (R. at 2047.)  On November 16, 2020, he reported feeling anxious because his psychiatrist had retired, and he needed a new mental health provider. (R. at 2043.)  Dr. Kumar referred him to Health Connect.  (R. at 2043.)  Over this time, Dr. Kumar diagnosed anxiety state; bipolar disorder; and depression, and he advised Raleigh to continue counseling and to practice stress management and relaxation techniques.  (R. at 1587, 2041, 2045, 2048, 2056, 2062.)  Dr. Kumar completed a mental assessment of Raleigh on December 21, 2020, finding he had no limitations on his ability to maintain personal appearance; moderate limitations on his ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability; marked limitations on his ability to deal with work stresses; to maintain attention/concentration; and to understand, remember and carry out detailed job instructions; and extreme limitations on his ability to understand, remember and carry out complex job instructions.  (R. at 1997-99.)  Dr. Kumar also

-29-

opined Raleigh would miss more than two workdays monthly. (R. at 1999.) He based these findings on Raleigh's trouble with focus, concentration and remembering; panic attacks; avoidance of social events; inability to follow simple tasks/instructions; and staying anxious. (R. at 1998-99.)

Raleigh also continued treating with Dr. Ehtesham from January 10, 2020, through October 13, 2020. (R. at 2103-56.) Over this time, his examinations continued to yield the same largely normal findings. (R. at 2103-56.) At some visits, Raleigh complained of increased depression or anxiety symptoms, while at others, he reported doing "ok," "so so," "better," "pretty good" and being "a lot better" on his medications. (R. at 2103-56.) On March 3, 2020, Raleigh even reported not feeling sad or nervous. (R. at 2144.) Even when he complained of worsened symptoms, he continued to deny suicidal ideation. (R. at 2103, 2127, 2138-39, 2148-49.) Dr. Ehtesham diagnosed bipolar disorder, mixed, moderate; and generalized anxiety, and she adjusted Raleigh's medications to address his mental health needs. (R. at 2103-56.) At the October 13, 2020, appointment, Raleigh stated he was sad, but not suicidal, and on examination he had fair insight and judgment, intact reality testing and goal-oriented thought process. (R. at 2103, 2105.) Dr. Ehtesham increased his lithium dosage. (R. at 2105.)

Raleigh saw Allyson Price, a resident in counseling at Health Connect, on December 11, 2020, for a Comprehensive Needs Assessment. (R. at 2442-71.) Raleigh reported struggling daily due to severe anxiety and depression, including not being able to get out of bed some days and having lost interest in everything. (R. at 2443.) He stated that he had become physically aggressive with loved ones, had suicidal ideation, feared crowds, and his hygiene had been directly affected by his severe sadness and anxiety. (R. at 2444.) However, Raleigh stated he could complete age-appropriate daily living skills, he denied conflicts with others, and he

stated he had two close friends who were like family.  (R. at 2451.)  He listed job loss as a current stressor, noting he recently quit his job due to depression and anxiety. (R. at 2452.)  Raleigh reported there was nothing he currently enjoyed doing in his free time, although he enjoyed riding horses in the past.  (R. at 2453.)  He reported experiencing blackouts and memory problems.  (R. at 2456.)  Raleigh reported his two inpatient psychiatric hospitalizations for severe sadness, anxiety and possible suicide attempt.  (R. at 2459.)  On mental status examination, he was fully oriented, cooperative, neat and clean, with normal grooming and a euthymic mood and appropriate affect; he had fleeting eye contact; normal speech; normal attention/concentration; normal recall/memory; normal thought content; average fund of knowledge and intelligence; normal judgment; normal decision making ability; normal social judgment; stooped posture; and unremarkable motor activity. (R. at 2467-68.)  Price noted Raleigh presented as anxious with a flat affect, and he was guarded and resistant with vital information.  (R. at 2470.)  She recommended outpatient counseling to address coping skills and for medication management.  (R. at 2470-71.)

Raleigh began medication management with Rachel Burke, N.P., a nurse practitioner at Health Connect, on December 30, 2020, via telehealth.  (R. at 2225.) On examination, he was alert and fully oriented, with a euthymic mood and good range affect without lability; he was clean and cooperative; he made good eye contact; exhibited normal muscle strength and tone; had a normal gait and station; normal speech; thought processes and associations were logical and goal-directed; he displayed no evidence of abnormal thought content, suicidal or homicidal ideation; judgment and insight were age-appropriate; recent and remote memory were intact; attention/concentration was good; he comprehended spoken commands; and fund of knowledge was intact/adequate.  (R. at 2226-27.)  Raleigh reported a history of suicidal and homicidal ideation, as well as auditory hallucinations, but

denied all of these at the time of this appointment. (R. at 2227.) Burke deemed Raleigh's existing mood disturbance, depression and anxiety all stable. (R. at 2228-29.) She diagnosed an unspecified depressive disorder, mild, with mixed features, and she continued his medications, including lithium, Depakote and Seroquel. (R. at 2228-29.)

Raleigh continued to treat with Dr. Kumar from March 8, 2021, through July 22, 2021. Over this time, he consistently exhibited normal findings on examination, including being pleasant, coherent and fully oriented, with an appropriate affect; he responded appropriately to questions; he was well-groomed; extremities were normal, including no edema, no calf tenderness, no clubbing or cyanosis, brisk capillary refill and 2+ and equal radial and pedal pulses, bilaterally; good musculoskeletal range of motion, with no joint deformity, swelling, erythema or crepitus; a stable and fluid gait; and grossly intact cranial nerves. (R. at 2362, 2364, 2366, 2369.) Dr. Kumar continued Raleigh's medications, and he advised him to lose weight, eat healthy and engage in aerobic physical activity and stress management. (R. at 2362, 2364, 2366, 2369.) X-rays of Raleigh's left knee, dated March 9, 2021, showed no acute findings. (R. at 2234.)

Raleigh was seen by telehealth at the Owsley County Behavioral Health Clinic on March 17, 2021, for symptoms of bipolar disorder. (R. at 2000.) He endorsed periods of depression, as well as episodes of both hypomania and mania, and he reported his symptoms had increased over the last few months. (R. at 2000.) Raleigh reported a depressed mood with anxious affect. (R. at 2000.) He was fully oriented, engaged and cooperative; he had appropriate hygiene and weather-appropriate clothing; and he denied suicidal or homicidal ideation and hallucinations. (R. at 2000.)

Raleigh underwent a consultative examination by Dr. Jacob A. Nysather, D.O., on March 20, 2021, at the request of Disability Determination Services. (R. at 2236-41.) He endorsed low back pain, mood changes, depression, anxiety, difficulty concentrating and difficulty sleeping at night. (R. at 2237.) Raleigh reported medication and counseling helped his mental health symptoms, and he denied current suicidal or homicidal ideation and hallucinations. (R. at 2236.) Raleigh rated his back and hip pain as a seven, on average, but aggravated by prolonged positioning. (R. at 2236.) He reported undergoing multiple injections without any improvement. (R. at 2236.) On mental status examination, Raleigh was alert and fully oriented; cooperative with the exam;[13] did not appear depressed or anxious; he was appropriately dressed; he communicated without deficits; and he displayed intact recent and remote memory and good insight and cognitive function. (R. at 2237-38.) On physical examination, Raleigh ambulated without assistance; displayed decreased range of motion of the lumbar spine,[14] with tenderness to palpation that was out of proportion to touch/examination; straight leg raise testing was negative; there was no muscle asymmetry, atrophy or involuntary movements; he had an antalgic gait, but was able to rise from a sitting position without assistance and with only mild difficulty;[15] he could stand on tiptoes, heels and tandem walk without problems; he could bend and squat with moderate difficulty;[16] grip strength was full, with adequate fine motor movements, dexterity and ability to grasp objects,

---

[13] Dr. Nysather qualified this by stating his opinion that Raleigh was making tasks appear more difficult for him while being watched/observed. (R. at 2238.)

[14] Specifically, on a range of motion form, Dr. Nysather indicated Raleigh exhibited slightly reduced lumbar spine flexion of 80 degrees. (R. at 2240.)

[15] Dr. Nysather stated that Raleigh's effort/difficulty was likely due to being observed. (R. at 2238.)

[16] Again, Dr. Nysather stated Raleigh made a poor effort/had difficulty while being watched, but was easily able to get up when he went to show him something. (R. at 2238.)

bilaterally; he displayed decreased range of motion of the left hip due to pain,[17] but there was no swelling, cyanosis or erythema; he exhibited strong neck movement against resistance and good shoulder shrug; he had good muscle tone and full strength in all muscle groups, bilaterally; there were no abnormal reflexes; and sensation was intact throughout. (R. at 2237-38.) Dr. Nysather diagnosed lumbago; left hip pain, unspecified; depression and anxiety; hypertension; and type 2 diabetes. (R. at 2238.)

He opined Raleigh could sit for a full workday; walk and/or stand for half a workday; lift/carry objects weighing up to 20 pounds; squat, crawl and stoop; and hold a conversation, respond appropriately to questions and carry out and remember instructions. (R. at 2238.) Dr. Nysather noted that, despite an antalgic gait, Raleigh's gait was preserved without needs of assistance. (R. at 2238.) He further noted Raleigh's mental status was preserved, with appropriate orientation, affect, thought content, memory and fund of information. (R. at 2238-39.) Dr. Nysather emphasized that Raleigh's efforts with regard to his back/leg pain were questionable, as he appeared to make activities more difficult and alter his behavior while being observed. (R. at 2239.)

Raleigh saw Anita McCullum, P.M.H.N.P., a psychiatric mental health nurse practitioner at Mountain Comprehensive Health Corporation, for an evaluation of bipolar disorder on April 19, 2021. (R. at 2001.) He rated his depression as an eight, and he endorsed more bad days than good, feeling on edge and restless, having racing thoughts, mood swings, irritability and agitation, stressors, intermittent sleep and obsessive thoughts. (R. at 2005.) Raleigh denied OCD or self-harm, as well as current suicidal or homicidal ideation and hallucinations. (R. at 2005.) On mental

---

[17] On the range of motion form, Dr. Nysather indicated Raleigh exhibited slightly reduced left hip flexion of 90 degrees. (R. at 2239.)

status examination, he was cooperative, with a normal appearance, stature and posture; average eye contact; normal activity; a depressed/anxious mood with a flat affect; clear speech; racing thoughts, but normal perception; no evidence of hallucinations; normal thought content; no delusions; impaired attention/concentration; average intelligence; and normal insight and judgment. (R. at 2002.) McCullum diagnosed bipolar disorder, current episode mixed, moderate, and she prescribed Depakote, Vraylar, Seroquel and Vistaril. (R. at 2002, 2007.) Raleigh continued treating with McCullum through August 2021. When he returned on May 3, 2021, his mental status was the same, except his mood no longer was anxious; his affect was full; and he no longer had racing thoughts. (R. at 2403-04.) Raleigh denied any new stressors and stated he was spending time outside to try and keep busy. (R. at 2403.) McCullum's diagnosis remained the same, and she adjusted Raleigh's medications. (R. at 2405.) Later that month, on May 24, 2021, Raleigh's mental status was substantially the same, except his mood, again, was described as both depressed and anxious. (R. at 2410-11.) McCullum adjusted his medications. (R. at 2412.) On July 20, 2021, Raleigh reported his health issues as a stressor, and he reported having more bad days than good. (R. at 2417.) His mental status was largely normal and unchanged, and McCullum made medication adjustments. (R. at 2418-19.) By August 24, 2021, Raleigh denied specific stressors, and McCullum, again, made medication adjustments. (R. at 2425, 2427.) Over this time, Raleigh consistently denied suicidal or homicidal ideations and hallucinations, and his judgment and insight were fair. (R. at 2410, 2412, 2417, 2419, 2425-26.)

On June 18, 2021, Leigh A. Ford, Ph.D., a licensed psychologist, completed a consultative psychological examination of Raleigh at the request of Disability Determination Services. (R. at 2345-50.) On mental status examination, Raleigh was cooperative, with a pessimistic and somewhat depressed mood and variable affect; he maintained eye contact; speech was normal; thought content was

appropriate and consistent with mood; he demonstrated no signs of delusional behavior; organization of thought was logical and goal-oriented; judgment was fair; reality testing was good; he had gaps in insight regarding his own psychological functioning; and coping skills appeared overwhelmed.  (R. at 2346-47.)  Raleigh scored 23/30 on the Montreal Cognitive Assessment, ("MoCA"),[18] with 26 or above considered normal.  (R. at 2347.)  He correctly repeated five words read to him, five digits forward and three digits backwards; he was unable to complete Serial 7s; he exhibited poor verbal fluency; he could freely recall two of five words read to him previously; and he was fully oriented.  (R. at 2346-47.)  Ford diagnosed Raleigh with unspecified bipolar and related disorder; and generalized anxiety disorder, and she deemed his prognosis guarded.  (R. at 2348.)  She opined Raleigh was not limited in his ability to understand, remember and carry out instructions toward the performance of simple, repetitive tasks; moderately limited in his ability to sustain attention and concentration toward simple, repetitive tasks and to respond appropriately to supervision, co-workers and work pressures; and moderately to markedly limited in his ability to tolerate stress and pressure of day-to-day employment.  (R. at 2348.)

Dr. Kumar completed a final physical assessment of Raleigh on October 26, 2021, finding he could lift/carry 15 pounds occasionally and five pounds frequently; stand/walk a total of three hours in an eight-hour workday, but for 10 minutes without interruption; sit a total of three hours in an eight-hour workday, but for 10 minutes without interruption; occasionally kneel, balance and crawl, but never climb, stoop or crouch; never operate heavy machinery or work around vibration; and his ability to push/pull was affected by his impairments.  (R. at 2472-74.)  He opined Raleigh would miss more than two workdays monthly.  (R. at 2474.)  Dr.

---

[18] The MoCA is a highly sensitive tool for early detection of mild cognitive impairment. *See* https://www.mocacognition.com (last visited Aug. 4, 2023).

Kumar based these findings on Raleigh's lower lumbar paraspinal pain/spasms/tenderness; bilateral knee pain, stiffness and swelling; tingling and numbness in both feet; and low back stiffness. (R. at 2472-74.)

## *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Raleigh argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Dr. Kumar, Dr. Ehtesham and McCullum, instead, relying on the "outdated" opinions of the state agency reviewers. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.)

Raleigh protectively filed his applications in February 2018 and October 2020; thus, 20 C.F.R. §§ 404.1520c, 416.920c govern how the ALJ considered the medical opinions here.[19] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his

---

[19] 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2022). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2022). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (2022). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[20] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2022). The ALJ found Raleigh had the residual functional capacity to perform sedentary work, except he could lift and carry items weighing 15 pounds occasionally and five pounds frequently; he could stand/walk for two hours and sit for six to eight hours of an eight-hour workday; occasionally push and pull with all extremities and occasionally operate foot controls; frequently, but not constantly, reach, handle and finger, bilaterally; never crawl or climb ladders or scaffolds; occasionally kneel, crouch, stoop, balance and climb steps or stairs; he should avoid concentrated exposure to extreme cold temperatures and avoid all exposure to particularly

---

[20] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2022).

dangerous hazards, such as moving machinery and vibrating surfaces; his concentration, persistence, maintaining of pace and cognition were adequate for performing simple, routine tasks and following simple (non-complex) work instructions; he could occasionally interact with the public, co-workers and supervisors; and he could not perform fast-paced production work.  (R. at 1625.)

In making his residual functional capacity finding, the ALJ found Dr. Kumar's, Dr. Ehtesham's and McCullum's mental assessments of Raleigh unpersuasive.  He found the opinion of state agency psychologist Montgomery partially persuasive and that of state agency psychologist Leizer persuasive.  With regard to Raleigh's physical residual functional capacity, the ALJ found the physical assessments of Dr. Kumar partially persuasive and the opinions of state agency physicians Drs. Brown and Hutcheson unpersuasive.  I first will discuss the ALJ's consideration of the mental opinions.  For the reasons that follow, I find that the ALJ properly considered them.

In his decision, the ALJ found Dr. Kumar's December 2020 and October 2021 mental assessments, containing several moderate to extreme limitations in making occupational, performance and personal/social adjustments, unpersuasive.  (R. at 1642.)  Specifically, the ALJ explained that such opinions were not supported by Dr. Kumar's own examination findings, including consistent findings that Raleigh was pleasant, he displayed an appropriate affect, and he responded appropriately to questions.  (R. at 1642.)  The ALJ further noted that Dr. Kumar even made such findings on the same day he completed the October 2021 assessment.  (R. at 1642.)  The ALJ further noted that Dr. Kumar did not treat Raleigh's mental health impairments.  (R. at 1642.)  Next, the ALJ found that, while Dr. Kumar's opinions that Raleigh had some moderate mental limitations generally were consistent with the overall record, including examination findings by his psychiatrist, the evidence

was not consistent with Dr. Kumar's finding of marked or extreme limitations in any area.  (R. at 1642.)  In particular, the ALJ noted the record showed, at most, that Raleigh had a variable mood and affect, and there were rate notations of insight and judgment limitations.  (R. at 1642.)  Otherwise, Raleigh's mental status findings were intact.  (R. at 1642.)

For all these reasons, I find the ALJ properly considered the supportability and consistency factors in evaluating the mental assessments of Dr. Kumar, and substantial evidence supports his evaluation of their persuasiveness in assessing Raleigh's residual functional capacity.

The ALJ also found the March 21 and December 5, 2019, mental assessments completed by Dr. Ehtesham unpersuasive.  (R. at 1640-41.)  In these assessments, Dr. Ehtesham opined Raleigh had multiple extreme and marked limitations, including in his ability to interact with supervisors, to deal with work stress, to follow work rules, to relate to co-workers, to maintain attention and concentration, to deal with the public, to behave in an emotionally stable manner and to demonstrate reliability.  In these assessments, Dr. Ehtesham opined that Raleigh either would miss about two workdays monthly or more than two workdays monthly. The ALJ stated he did not find these assessments persuasive because they were more restrictive than warranted by the mental evidence of record.  (R. at 1640.)  Specifically, he noted Raleigh's diagnoses of anxiety and depression, but that he had moderate, instead of marked, limitations in the "B" criteria.  (R. at 1640.)  The ALJ also noted that Raleigh was prescribed psychiatric medication with some benefit, and he briefly attended counseling in March 2018 and December 2019, but reported it was hard to open up.  (R. at 1640.)  He noted Raleigh's psychiatric hospitalizations in October 2017 and October 2019 for suicidal ideation, but that he was discharged to outpatient services within a week each time.  (R. at 1640.)  The ALJ stated that,

although Raleigh reported having panic attacks related to crowds, these were helped with Klonopin. (R. at 1640.) He also stated that, while mental status examinations sometimes reflected an anxious or depressed mood or affect, and poor insight and judgment were noted when he was psychiatrically hospitalized for suicidal ideation, Dr. Ehtesham's treatment notes from 2019 and 2020 were sparse and generally noted a variable mood and affect, but otherwise intact findings. (R. at 1640-41.) Likewise, Raleigh's objective mental status findings were consistent when he switched to a different mental health provider in 2021. (R. at 1641.) The ALJ also noted that Raleigh reported doing a wide array of activities, including household chores, caring for his mother after surgery and caring for a friend's horses. (R. at 1641.) He stated that, although Dr. Ehtesham prescribed psychiatric medications in 2019, she took only brief notes of Raleigh's mental issues, observed benign mental status examination findings and, generally, refilled the same medications at each visit. (R. at 1641.)

For all these reasons, I find the ALJ properly considered the supportability and consistency factors in evaluating the mental assessments of Dr. Ehtesham, and substantial evidence supports his evaluation of their persuasiveness in assessing Raleigh's residual functional capacity.

Next, the ALJ found the November 2021 mental assessment of McCullum, that Raleigh had moderate to extreme limitations in making occupational, performance and personal/social adjustments, unpersuasive. (R. at 1643.) In his decision, the ALJ stated this opinion was not supported by McCullum's own objective examination findings, which generally noted a depressed or anxious mood, but that Raleigh's affect, appearance, eye contact, activity, attitude, speech, thought process, perception, thought content, cognition, intelligence, insight and judgment all were within normal limits. (R. at 1643.) Moreover, the ALJ found McCullum's

opinion was inconsistent with the overall record, which showed a variable mood and affect and only some deficiencies in insight and judgment, but otherwise normal objective examination findings, as stated above. (R. at 1644.) Additionally, the ALJ stated Raleigh, generally, was maintained on an outpatient basis with medications prescribed by his mental health provider, aside from two hospitalizations resulting from an exacerbation of symptoms related to situational stressors. (R. at 1644.)

For all these reasons, I find the ALJ properly considered the supportability and consistency factors in evaluating the mental assessment of McCullum, and substantial evidence supports his evaluation of its persuasiveness in assessing Raleigh's residual functional capacity.

Lastly, with regard to Raleigh's mental residual functional capacity, the ALJ found the July 9, 2018, opinion of state agency psychologist Montgomery partially persuasive and the September 25, 2018, opinion of state agency psychologist Leizer persuasive. (R. at 1638-39.) Montgomery opined Raleigh had no limitation in understanding, remembering or applying information, as well as adapting or managing himself; and moderate limitations in interacting with others and in concentrating, persisting or maintaining pace. (R. at 1638.) Leizer opined he had moderate limitations in all these areas. (R. at 1639.) The ALJ stated Montgomery's opinion was only partially persuasive because, while it, generally, was consistent with the mental evidence of record, set out above, and was supported with citations to relevant evidence, Raleigh also had moderate, instead of no, limitations in understanding, remembering or applying information and in adapting or managing himself, just as Leizer later opined. (R. at 1638-39.) The ALJ also noted that both Montgomery and Leizer had reviewed the mental records available in 2018 and had experience with the rules and regulations of the disability determination process. (R. at 1638-39.)

For all these reasons, I find the ALJ properly considered the supportability and consistency factors in evaluating the mental assessments of the state agency psychologists, and substantial evidence supports his evaluation of their persuasiveness in assessing Raleigh's residual functional capacity.

Based on the mental evidence of record, the ALJ concluded that Raleigh's psychiatric disorders were considered in the residual functional capacity by limiting him to the performance of simple, routine tasks with simple, noncomplex work instructions, occasional interaction with others and no fast-paced production demands. (R. at 1638-39, 1641.)

With regard to Raleigh's physical residual functional capacity, the ALJ found all four of Dr. Kumar's assessments – dated June 24 and December 16, 2019, December 21, 2020, and October 26, 2021 – partially persuasive. (R. at 1641.) Specifically, he found that they were persuasive to the extent they were consistent with a sedentary range of exertion with postural and environmental limitations, as such findings generally were consistent with the medical evidence of record and supported by Dr. Kumar's objective examination findings. (R. at 1641.) However, the ALJ further found that the overall record supported a finding that Raleigh was able to sit for six to eight hours in an eight-hour workday and stand/walk for two hours in an eight-hour workday. (R. at 1641.) He noted that Dr. Kumar's opinions related to Raleigh's ability to sit and to stand/walk were not supported by his own findings, as he often noted normal musculoskeletal and neurological objective examination findings during visits, including a good musculoskeletal range of motion; no swelling, erythema or crepitus; and a stable and fluid gait. (R. at 1641-42.) Moreover, the ALJ noted that, at Raleigh's visit on the very same day as the most recent physical assessment completed by Dr. Kumar in October 2021, he indicated Raleigh had a good range of motion, no joint deformity and no swelling,

erythema or crepitus.  (R. at 1641-42.)  Dr. Kumar also noted Raleigh's gait was stable and fluid, and he was neurologically intact.  (R. at 1642.)  Such findings, according to the ALJ, do not support Dr. Kumar's opinion that Raleigh had the ability to sit for only three hours in an eight-hour workday and stand/walk for only three hours in an eight-hour workday.  (R. at 1642.)  Moreover, the ALJ concluded that, for the same reasons, Raleigh would not miss more than two workdays monthly, as Dr. Kumar consistently opined, and that portion of his assessments also was inconsistent with the overall record.  (R. at 1642.)  In particular, the ALJ stated that the record reflected that Raleigh had low back pain with radiation down the left leg or sciatica from lumbar degenerative disc disease.  (R. at 1642.)  He also had arthralgia of the left leg with bursitis in his left knee and tearing in his left hip, shown on MRIs.  (R. at 1642.)  The ALJ stated that, while Raleigh had undergone injections in the left hip, SI joint and lumbar spine, he had received no surgical recommendations at any of his several neurosurgical consultations, and although he had tried home exercises, he had never completed a formal physical therapy program.  (R. at 1642.)  He stated Raleigh's pain usually was treated with pain medication, such as Neurontin, from a primary care physician.  (R. at 1642.)  The ALJ also stated that, while examinations sometimes showed an antalgic gait, at other times, Raleigh's gait was stable and fluid, and he did not require an assistive device. (R. at 1642.)  While straight leg raise testing sometimes was positive on the left; the lumbar spine had limited flexion, without tenderness to palpation; there was tenderness over the sciatic notch; there was a positive FABER sign and thigh thrust; and anterior tibialis was slightly reduced to 4/5 in the left leg, Dr. Kumar noted no significant objective symptoms throughout 2020 and 2021.   (R. at 1642.) Additionally, Raleigh reported doing a wide variety of activities, such as household chores, caring for his mother after surgery and caring for horses belonging to a friend.  (R. at 1642.)  Lastly, the ALJ correctly stated that, although Dr. Kumar was

Raleigh's primary care physician, he generally only refilled his chronic medications, preferring to refer Raleigh to specialists for any additional treatment. (R. at 1642.)

For all these reasons, I find the ALJ properly considered the supportability and consistency factors in evaluating the physical assessments of Dr. Kumar, and substantial evidence supports his evaluation of their persuasiveness in assessing Raleigh's residual functional capacity.

Next, the ALJ found the physical residual functional capacity assessments completed by state agency physicians, Drs. Howard and Hutcheson, on July 9 and September 25, 2018, respectively, unpersuasive. (R. at 1637.) In particular, the ALJ stated that both Dr. Howard and Dr. Hutcheson opined Raleigh could perform light work, a finding that was less restrictive than warranted by the medical evidence of record. (R. at 1637-38.) The ALJ found, instead, that Raleigh could perform only sedentary work based on his combination of impairments. Specifically, the ALJ found Raleigh could stand or walk for two, instead of six hours in an eight-hour workday, and he could never, instead of occasionally, crawl and climb ladders, ropes or scaffolds. However, the ALJ found Dr. Howard's and Dr. Hutcheson's opinions that Raleigh could occasionally use the left foot for the operation of foot controls to be consistent with his left lower extremity issues. (R. at 1637-38.) The ALJ then proceeded to state the same medical evidence as set out above in connection with his consideration of Dr. Kumar's assessments in considering the consistency of the state agency physicians' opinions with the other evidence of record. (R. at 1637-38.) In addition to that evidence, the ALJ noted that providers throughout 2020 and 2021 found no objective musculoskeletal or neurological abnormalities, and Raleigh required no emergency treatment, urgent care or inpatient hospitalization for his musculoskeletal complaints. (R. at 1637-38.) Lastly, the ALJ noted that Drs.

Howard and Hutcheson did not treat Raleigh in person and did not have access to his medical records created after 2018. (R. at 1637-38.)

For all these reasons, I find the ALJ properly considered the supportability and consistency factors in evaluating the physical assessments of the state agency physicians, and substantial evidence supports his evaluation of their persuasiveness in assessing Raleigh's residual functional capacity.

Based on all the above reasons, I find substantial evidence exists to support the ALJ's consideration of the medical evidence, as well as his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Raleigh was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Raleigh's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    September 1, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE